All right. Our second case for this morning is brought by the Pension Trust Fund for Operating Engineers and others against Kohl's Corporation. Mr. Daly. May it please the Court. I'm Joseph Daly for the Institutional Investor Plaintiff Appellant. This morning, Your Honors, I'll be discussing two issues. First, whether under this Court's de novo review, we've sufficiently alleged a strong inference of Santa in connection with the defendant's conceitedly false financial results reported to investors over five straight years. And second- Well, and let's be careful. You say Kohl's made corrections to its accounting for the leases, right? That's correct. So one set of corrections in 2005, later corrections, which may or may not be related enough to give rise to some inference. There's obviously a dispute between the parties about that. Then we also have Mr. Mansell, the CEO, who is a defendant, and Mr. McDonald, the CFO, and what their role is. That's correct. So I want to be careful when we say defendants or sweeping them all in. I apologize. Yes, there are the two individual defendants, the CEO and the CFO, and then Kohl's self. And then the second issue that I'll be talking about is whether or not the District Court abused its discretion when it dismissed with prejudice without leave to amend- Let me ask you about that. Maybe we can dispose of that fairly quickly. All right. I agreed with a lot of the law that you cited in your brief on that point, but I have yet to see any indication from you all as to how you would have amended in order to address the problems. And given that, what would be the point? We didn't have to show that because there was no pending motion for leave to amend- Why didn't you tell us in your blue brief that you had some cure for the ills the District Court found? Again, Your Honor, we believe that what Judge Steidmuller did was an abuse of discretion- I understand that. Yes. I have the same question. I tend to agree in the abstract, but I don't see any harm without an explanation from you all as to what you would have changed to fix those problems. Well, the harm is that he dismissed with prejudice- We understand that, but he's identifying gaps in the Scienter story in particular. There are many elements of these cases. And I would have, exactly as Judge Hamilton is saying, I would have thought that you would say, Oh, you know, we didn't put in enough about Scienter. We were prepared to add this and that, and he never gave us a chance to. But there's no this and that in the record. And so the question is, could you have used that second opportunity to good purpose? Well, then that is on me, Your Honors. I did not put that in my brief. I didn't think it was appropriate at that point. I was focused on the clear legal error that the second judge made in thinking that Judge Clevert had pointed out, quote, weaknesses to us on the first program. No, you're right about that. Judge Clevert didn't. But on the other hand, there's an overall harmless error rule that applies to all civil litigation. And even if it was a mistake not to give you a second chance, it was futile, for example, then there's no harm, no foul. You just affirm. All right. Well, I did not put anything in there. And I'm going to pile on, I'm afraid. But even if we merely require circumstantial rather than direct evidence of Scienter, don't we still need some factual information that ties the defendants to knowledge that would satisfy the Scienter requirement? You know, something that shows more than just they ought to have known. Well, Judge Robner, you said two things. You said one thing just then, circumstantial evidence is enough. And you said another thing in the prior presentation where it was the sum total of the parts. And under the Supreme Court's decision in tele-abs, we are allowed to give the court an amalgamation of the facts that must be considered together. I agree. There's no one single piece of direct evidence tying the two individual defendants with their Scienter. Look, this case revolves around accounting errors. Accounting, it seems to me, is the type of art for which there is usually a lot of paper trial. Shouldn't there be some evidence about how and when Cole's officers came to know about the accounting errors? Well, there is. Within the record, there are indicia of things like that. Let's not forget the earlier 2005 restatement. Both of these gentlemen were in their present positions, CEO and CFO of the company at that time. But your opponent suggests that the 2005 errors were of a different type. Now, if you're just saying at some general level there are generally accepted accounting principles about the way you account for leased stores. Cole's has 65% of its stores leased. Okay, fine. That's certainly not what the PSLRA is looking for. If you start digging down and you say, well, you know, some leases carry with them enough indicia of ownership that from an accounting point of view, never mind who's paying the property taxes, but from an accounting point of view, you actually report them in a way that looks much more like owned assets. That's correct. Okay, fine. You can do that. But how do we go from the fact that there are these generally accepted accounting principles to either the knowledge or the reckless disregard of Mr. Mansell and Mr. McDonald that their accountants are not doing what they should be doing when they are portraying Cole's financial results? Well, Judge Wood, at one point you said something about general rules, and you weren't necessarily talking about GAAP, but you said just generally. But the thing about the leasehold accounting, it is a very specific type of accounting. In fact, the defendant's briefs are permeated with the details of that lease accounting. And frankly, it didn't look all that hard to me to tell you the truth. Me neither. Not complex or technical. It's a binary choice. When you are faced with a leasehold, you need to account for that lease either when you start paying rent or when you start moving fixtures into the building or doing repairs or improvements like putting on a new roof or heating and air conditioning system. And how do we know that Mr. Mansell and Mr. McDonald didn't know, lease by lease, whether Cole's was doing what it should have been doing in that respect? Mr. Mansell and Mr. McDonald told our clients, the class, in at least 10 SEC filings, we have put into place specific internal controls over our financial process. And they were mistaken. You agree that just a mistake or negligence isn't enough. Of course I would agree with that. But this was recklessness at the least and probably deliberate. And why? I mean, that's a label. And what we need is some meat on the bones. All right. Do you have any, any factual information that can pinpoint or even approximate when Cole's knew that it had some technical errors in accounting that required a correction? I just didn't see it. There is no direct evidence. There's no email. There's no transcript of a phone call when somebody from accounting called Mr. Mansell up and said, we've got a problem here. What we do have, and I realize I'm sounding a little bit like a broken record, but it's true. What we do have is a very strong circumstantial evidence of a seven-year restatement, which I disagree, Judge Wood, with our opponent's characterization. The earlier restatement involved the beginning and the end of leaseholds. That was part of the problem here. In this latest restatement, it involved the beginning of the leasehold. Cole's came out and conceded that we had used an approximation, a prospective date, for starting the leasehold when we had actually told you over ten times that we will start accounting for the leasehold when we take possession of the building. You can approximate. There's some talk in their briefs about approximating, looking forward, that, well, they had to make these estimated possession dates. But you know what? Reported financial figures look backwards in time. At the end of the year, when they're signing a 10-K, when they're filing their annual report, they know what the date was when that leasehold began. They may have approximated it back in the middle of the year. We think we're going to move into our Madison, Wisconsin store on August 1st. But lo and behold, what happens? July 1st, they actually happen to move in. They know at the end of the year the exact date. Let me follow up, if I could, with that, Mr. Daly. Because you've described this as a billion-dollar-plus restatement. Yes. Do these issues have any effect on cash flow? I don't know the answer to that. I can tell you the four broad categories. Certainly I would think any one of the four would matter to reasonable investors, but that's not a question that could be answered at this stage. No, but you're arguing that the magnitude and severity and frequency of these issues help support an inference of CIANTR when you're talking about the CEO and CFO. But they seem to have had, at best, extremely modest effects on reported net income and shareholder equity. And I didn't hear that. You said what? Net income? Yes, on reported net income and on shareholder equity. The net income was understated 3.4% at one point and 3.6%. In fact, this court in the Higginbotham case says in a footnote that an often-used rule of thumb, 3% of a large number can be considered material to investors. Both of the 3.4% and the 3.6% are over that. And certainly the net income was at 5% understated. The question is not about materiality. I understand. The question is about what at least looks to me like something with no effect on cash flow and very modest effects, which seems to me to weaken that inference of CIANTR you want readers to draw. A couple of responses, Judge Hamilton. Number one, that assumes that Mr. Mansell and Mr. McDonald only cared about one metric in their financials every year, and that was cash flow. That's not enough. I mean, there are $2 billion in understated debt. And how about understated assets? I don't know the figure. Well, isn't the question here, maybe I'm not fully appreciating the issues, but I thought the question in essence is when do you treat these obligations as just expenses and when do you treat them as both as a capital lease, which you have to list, as I understand it, as both an asset and a liability. But, Judge Hamilton, it sounds as though we're debating the significance of the restatement itself and just by dint of the fact that they restated... We are, because of your argument that the frequency and magnitude of the corrections is what supports the inference of CIANTR, among other things.  So please answer the question. All right. And again, the magnitude, it's almost $1.4 billion every year for five years, understated liabilities. And what about understated assets? Again, I don't know that figure. Speaking of things that you say you don't know, let me ask you this. Do you agree that both of the individual defendants expanded their stock holdings in Kohl's over the class period? I don't know. That's not in the record, Your Honor. It's not in the record, but are Form 4s matters of public record? They are, but the initial district court decided not to look at those Form 4s. But they are matters of public record. I want to follow up on this. They are matters of public record, but you can't necessarily accept statements within them for the truth of the matter asserted. Okay. Maybe these officers of this big publicly held company are simply lying about their own personal stock holdings. It seems unlikely, but it's possible. But is it reasonable to infer that you've pled the strongest case you can with respect to insider trading? I imagine that is true. Yes, it is reasonable. And have you focused on sales? And those documents would also have answered my question about the defendant's point that the net transactions over the class period expanded their holdings. But that argument in their brief is based upon materials that were stricken from the district court record, so I don't know why we're even discussing it. I'll tell you why. Because you're asking us to draw inferences. And you're asking us to draw inferences from a very selected piece of the public record that was available to you. That's why I'm asking you the question. All right. I appreciate that. But the sales, as you also know from our briefing, is a very small piece of the overall mosaic of CIANTRA here. We don't even need motive or sales. They happen to be there. No, you don't, but you've emphasized them a good bit. You have emphasized them. Without any evidence, it seems to me that the insider stock sales were suspiciously timed. Is there any evidence that McDonald and Mansell knew of the errors a year before and seven months before the announcement of the accounting review? I keep looking for evidence, evidence, evidence. And I'm sorry, Your Honor. Again, all we need at this point is circumstantial evidence. We have alleged that they did not sell in the year prior to the class period. We also have alleged that they did not sell again in the year 2011. And on just two days in the middle of the class period, the CEO sold $7.something million of his own stock. That's an allegation that must be accepted as true at this point. And other items about trading plans and perhaps overall holdings, that is simply just not in the record. I'd like to reserve 22 seconds. You have very little left, but reserve away, and we will hear from you then. Mr. Jufra. Good morning, Your Honor. Robert Jufra for Mr. Mansell, Mr. McDonald, and for the Colts Corporation. This complaint was filed in 2013. Since that time, I've been looking for exactly what the court has been looking for, which is actually particularized allegations that Mr. Mansell or Mr. McDonald actually knew about these accounting issues before they were disclosed to the shareholders of the company. Well, what worries me most about this whole case, actually, given that the PSLRA can be very difficult to find that magic moment when the inferences in favor of liability are equally balanced with those against. And I'm bothered that the successor district court judge didn't just say, you know, you'll have one chance to file an amended complaint. People may not realize that they've got to conjure up all of the hypothetical things that they would put in an amended complaint. I mean, I would like to know, for example, and I was looking at the public record, you know, how many shares does Colts have? You know, what percentage are we talking about? What, you know, just different things that might help you understand why there either is or is not either recklessness with these leases or worse. Well, Your Honor, I think the reason is because when I look at these types of complaints, in this complaint there's no allegation of a government investigation. There's no allegation of a single confidential witness. No, what you have that's very unusual here is the sequence from the 2005 restatement and the 2011 restatement. And I'd be very interested to have you explain as specifically as you can what you understand to be the differences between the issues with attention to Colts promise in 2005 to stop using estimated starting dates for leases. Your Honor, what happened in 2005 was the SEC came out with some guidance on accounting. Immediately the company did a disclosure. For retailers generally? It was with respect to what do you do with respect to how do you calculate and amortize leasehold improvements over the course of a lease? And do you just look to the term of the lease or do you look to the expected renewal periods? And these are long, long leases where there are multiple renewal periods. In the lease you could have the property for 50 years literally. And so the question was do you have to extend it over that 50-year period or over something that's 25 years? And so it was at the back end. So it was reducing the amount of depreciation that could be taken? Correct. That's correct. And then in 2010 the issue was that the company had started to do much more aggressive and expansive involvement in construction of the properties. And the question was, well, do you look at when the actual lease term begins or do you look to when the construction actually is going on? And then there's a whole question, again, about whether you're dealing with things, for example, if the construction costs are being given to you back by the landlord as a form of a credit, whether that should be something that should be amortized. Part of the problem here, I think, is that because these leases are so long, ultimately when they started to look into it in 2010 and 2011, it became quite clear, and this was a question that Judge Wood asked, legal title was not with Kohl's. Legal title was with someone else. But for accounting purposes, they should have been treated as assets on the books of the company. Did any of the errors in the 2006-11 period involve the same leases at issue in the 2005 restatements that contained errors? Your Honor, I believe that some of the same, this is more than 700 stores, and I believe some of the errors occurred at different stores. The issue, of course, is that under the PSLRA you have to look to see, well, did the officers, the CEO, and the CFO know that there was a problem with respect to how this lease accounting was being done? There's nothing in the complaint, and if you look to literally A52 to 55, that's their additional scienter allegations. There is no notice from E&Y that there's a problem. E&Y, Ernst & Young, one of the best accounting firms in the country, was involved in this all the way through. There are no audit reports indicating that are referenced in the complaint indicating there's a problem. There's no allegation about a meeting. There's no allegation about an internal document that gave the CFO and the CEO people who are entitled to rely upon their external auditor and their internal auditing staff to follow. Well, they are. They are also obligated, among other things, under Sarbanes-Oxley, but they are obligated anyway to keep themselves sufficiently informed  No question, Your Honor. But there's no allegation that they were on notice in any way, shape, or form. But could you address this apparent disjunction between the magnitude, as alleged by plaintiffs, in the order of more than a billion-dollar difference in reported liabilities and what seem to be very modest effects on cash flow, shareholder equity, and or net income? Well, there's no question the impacts are relatively small. On net income in 2006, it's 1.7 percent. In 2007, it's 2.2 percent. I saw the numbers. I'm trying to understand the distance here. I think the accounting numbers are essentially as follows. Because some of these leases, because of the involvement of Kohl's in the actual construction process and the fact that Kohl's was actually incurring the expense of doing, for example, putting big air conditioning systems in these buildings, they had to be treated as capital leases. When they get treated as capital leases, they become assets on the books of the company. They also become a liability on the books of the company. Depreciation goes up. Rent expense goes down. So numbers will change. But in terms of your question before about cash flows, the cash flows are not different. And, in fact, in this particular case,  the company announced that it was continuing to look into the issue of the leases. Stock price went down because, and this was something that was stricken by Judge Clavert, the company had also announced in its public disclosures bad sales. On the 11th, August 11th, the company detailed what the errors were. The stock price went up 7 percent. So this was not something that the market cared about. It was really technical accounting issues that the company had made mistakes in and had not done a good job. But, of course, the PSLRA makes it quite clear that mistakes, negligence is not enough. And even if one takes recklessness, you need to show something that someone consciously avoided recognizing something they should have known. And there's no particularized allegation that Mr. Mansell or Mr. McDonald knew anything that was wrong with the accounting of this company. They had every right to rely upon the accounting staff and on Ernst & Young. Ordinarily, that carries a lot of weight as an argument in these circumstances. But what we keep hearing from the plaintiffs is, look, after the 2005 restatement that went back six or seven years in dealing with what at least seems like a related issue, the timing for treating leases as capital leases, seems to me that there's a decent argument that there's an obligation even at the top levels of the company who were dealing directly with investors and explaining those problems back in 2005 for more oversight. Yeah, I mean, it's basically on their radar screen at that point. They know, and what you're kind of saying is, by the time you have the assets and changes in depreciation and changes in treatment, somehow, miraculously, everything balanced out. But I'm not sure that would necessarily be the case. But I think the answer, Your Honor, is that the Private Securities Litigation Reform Act took these types of cases out of the realm of negligence-type cases. Oh, we know that, yeah. And so because you've got to be... We're veterans of tell-labs. You've got to... I mean, some of your arguments seem to imply to me that I'm hearing that Kohl's needed to have actual knowledge that the errors were occurring. Isn't recklessness sufficient here? Yes, but recklessness is defined in this circuit as someone ignoring the obvious. And the issue here is whether the... There's no particularized allegation. In fact, there's no allegation whatsoever with respect to the knowledge of the CEO or the CFO with respect to these accounting errors. Nothing. Well, how about this? You know, if you learned anything in 2005 in looking at these accounting principles that came out, some of which you put in your brief, a lot of these leases, the way Kohl's happened to structure its business, were essentially capital leases. And Kohl's wasn't doing that with them. It continued to kind of sail along as though they were just somebody leasing a warehouse for six months, and that's just not treated the same under the accounting principles. Well, Your Honor, I think, again, 2005 was really about the length of the period looking at the renewals. And the length tells you that it's a capital asset, right? I mean, it's looking at the projected useful life of the property. If you exhaust the useful life of the property, it doesn't mean much that you're going to give a nothing back to the lessor at the end. But, again, Your Honor, it goes to the basic point that under the PSLRA, the plaintiff has to come up with some sort of particularized allegations. And this complaint and the question that Judge Hamilton asked on whether there should be an amendment granted, they have never identified anything other than what they've strung together from the company's public disclosures. Right, but here's the paradox of the PSLRA, which the district courts are struggling with, which the Supreme Court... It's all well and good to say you need detail, but unless Coles is willing to invite the plaintiffs in to browse through its books, which, of course, Coles isn't and wouldn't be, and you don't expect that, there's only so much detail you're going to get from the public records. So plaintiffs have the burden of putting these complaints together without the benefit of discovery. That's the whole point, after all, of the PSLRA. Get it away from summary judgment, save the money, don't go through all this discovery. But it's a real... There's a real tension in the system, and so people do have to rely on circumstantial evidence for things like recklessness. Well, but, Your Honor, you can focus... They can certainly, as they did in the Tell Labs case, where they had 26 confidential witnesses, they could speak to people who work at the company, they could speak to former employees.  which has its own public reporting obligations, hasn't accused anyone of fraud, and they were presumably all over this accounting issue and how it was done and not done. So you all don't have any problems with investors' counsel talking to current employees? Did I hear that right? Your Honor, they certainly do it. Sometimes we send them letters saying that that's privileged, can be privileged, depending on what it is, but I certainly have been involved in many, many cases, in courts all around the country, where the plaintiffs have spoken to current employees and had them be confidential witnesses. In this case, they don't cite a single confidential witness. The only thing they cite... Maybe they were being ethical. Well, but they could certainly speak to former employees and they could certainly try to speak to the current employees if they want to, and they have nothing. Now, on the issue of the securities trading, which was referenced before by Judge Hamilton, I think it's important to note there that... I actually think Judge Clavert got it wrong, because once they put in what the trades are, we're allowed to put in the other side of the trades, and, in fact, the record based on the Form 4s does show that Mansell and McDonald increased their ownership of Kohl's stock over the course of the class period, and that's why they don't want to put in the Forms 3s and 4s. They just reference the trades without providing any context for it, and in any event... And we're required to take that for the truth of the information contained in the forms? Certainly for the fact that it's been reported as such, sure. But for the truth? I think the problem they have, Your Honor, is they don't provide any context, as the district court found, for their allegations about trading, and they've got to show that the trading was unusual and suspicious, and just putting trades on a... You know, the fact that the CEO and the CFO traded $8 million of shares over a two-year period is hardly problematic. In this court in Higginbotham, you were dealing with 4.5 and 1.5. The Navistar case, it was over 5 million. There are other cases that we cite where it's up as high as $50 million. So the mere fact that there's a sale by itself is not sufficient to show unusual or suspicious trading. Now, let me just say a word about... Let me just say a word about the denial of leave to amend, because I think this is important. First of all, it is an abusive discretion standard. And we've repeatedly found abusive discretion by striking the first version of a complaint without leave to amend. But in this case, Your Honor... It's an abusive discretion based on a mistake, because reading Judge Clavert's opinion makes it very clear that he has not in any way criticized this complaint for failing adequately to allege Cianter. He thinks it's boring and long and prolix and other things. No question. But he doesn't say... Too long, too short, it's a hard problem for avoidance. He doesn't say it doesn't allege Cianter. But this court has repeatedly... Let me cite a few cases. Gonzales, Kroenke, 791 Fed Third at 807. That's the 2015 decision. This court has made the point that where the plaintiff doesn't identify what they are going to plead, what are the additional allegations they are going to add to the complaint? When were they supposed to do that? Judge Stadmuller hands down his opinion. Do you think they should have filed a motion to reconsider somehow? Well, this was not... First of all, when they filed their original complaint, then there was an amended complaint that they filed when they were appointed lead counsel. We filed a motion to dismiss. They could have sought leave after that. But that's what... There's no rule in the adversary system that you have to take your opponent's criticism of your complaint as gospel, right? I mean, you criticized it. I understand that. But when did the judge? Not until Judge Stadmuller. And so after Judge Stadmuller's opinion, they were supposed to somehow come in and say, please reconsider and let us file an amended version? But they had their opportunity. What they did in the motion to dismiss the second time around, in a footnote, they said, oh, in a pro forma way, let us amend. They never identified what the additional pleadings would be. But they didn't know at that point. But they knew what we were saying about their pleadings. Counsel, look, that's a non-starter of an argument as far as I'm concerned. Well, in this court, they could have put a paragraph in their brief in this court. That's an argument. In this court, definitely. There's no question in this court they could have said, we're going to plead the following seven things. It would have taken one page. They have not done that. Even sitting here today, plaintiff's counsel can't cite a single allegation other than what was in the original complaint that was filed back in 2013 that they would add to this complaint. Nothing. And they certainly could have added something, and it would make no sense for a case that's gone on and on and on to send it back again when they haven't identified for this court what is the specific allegation that they would add that would get them to the point where under Tell Labs they could show that the reasonable inference was one that was cogent and more compelling than the inference of non-fraud. So, Your Honor, we think the court should affirm the decision below was correct. They have never identified any particularized allegations that the CFO or CFO knew about the issues with the accounting fraud. They were entitled to rely upon their accounting staff as well as on E&Y, and the court should affirm in all respects and should not send this back to have the plaintiffs finally maybe identify something. That would just be a complete waste of judicial and party resources. Thank you very much. All right. Thank you very much. Mr. Daly, I'll give you a full minute. Thank you, Your Honor. Two very quick points. Number one, Mr. Gifford kept on talking about knowledge, and what did the defendants know? We don't need absolute knowledge here. We just need recklessness. Second point, let's assume accepting arguendo their insistence that these accounting rules were technical and complex. One would think after the 2005 restatement, restating seven years of financials having to do with lease accounting, that in this technical and complex area, these two individual executives sitting at the top of coals would have paid even more attention to the lease accounting issues going forward, and we know that they recklessly did not. They reassured investors in ten consecutive SEC filings that they were paying attention to the financial controls, but that is not what happened. Thank you very much. All right. Thank you very much. Thanks to both counsel. We'll take this case under advisement, and the court will take a brief recess. Thank you.